UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHARLES DANIELS, CDCR #AA-4443,<br><br>Plaintiff,<br><br>v.<br><br>A. MORENO, et al.,<br><br>Defendants. | Case No.: 22-cv-1263-JO-KSC<br><br>**REPORT AND RECOMMENDATION RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br>**[DOC. NO. 66]** |

This Report and Recommendation is submitted to United States District Judge Jinsook Ohta pursuant to 28 U.S.C. § 636(b) and Civil Local Rules 72.1.e. and 72.3.e.

**I. INTRODUCTION**

Plaintiff Charles Daniels was an inmate at R.J. Donovan Correctional Facility ("RJD") during the events that give rise to his Complaint. Doc. No. 1. On August 22, 2023, plaintiff filed a verified Complaint pursuant to 42 U.S.C. § 1983 claiming RJD staff violated his civil rights by failing to respond appropriately to his self-reported complaints of suicidal ideation. *Id.* Plaintiff's claims originally involved five named defendants and three separate alleged suicide attempts that occurred on September 13, 14, and 15, 2021. *Id.* On April 8, 2025, the Hon. Jinsook Ohta adopted the undersigned's Report and Recommendation concluding plaintiff failed to exhaust all his claims except those alleged against defendants Correctional Officers Lechuga and Moreno relating to plaintiff's suicide

attempt on September 15, 2021. Doc. Nos. 59, 65. Plaintiff alleges on September 15, 2021, Officers Lechuga and Moreno violated the Eight Amendment by

> fail[ing] to intervene and protect plaintiff from his own self by maliciously allowing the plaintiff to break free from the grip of correctional staff not following protocol when a suicidal inmate is chained up in waist restraints to come forward out of the cell instead of walking out backwards being handled by gripping plaintiff by the arm escorting him the proper way to escort a suicidal inmate whispering to staff that "if the nigger wants to run and jump let him" and the other staff . . . saying "OK" when plaintiff took notice and leaped over the rail seeking death.

Doc. No. 1 at 7.[1] Based on these allegations, plaintiff claims defendants were deliberately indifferent to his health and safety.

On April 18, 2025, defendants filed a Motion for Summary Judgment ("Motion") on the remaining claim, arguing plaintiff cannot show they were deliberately indifferent to an excessive risk of self-harm or that they caused his September 15, 2021 suicide attempt. Doc. No. 66.[2] Alternatively, they argue they are entitled to qualified immunity. *Id*. The Court informed plaintiff of the requirements of the summary judgment rule and ordered him to file any opposition by May 9, 2025. Doc. No. 69 at 2. Plaintiff does not oppose the Motion.

For the following reasons, the Court recommends granting defendants' Motion.

//
//
//
//

---

[1] The Court refers to the CM-ECF assigned page numbers when citing filed documents.

[2] On April 23, 2025, the Court provided plaintiff with "fair notice of the requirements of the summary judgment rule." *Klingele v. Eikenberry*, 849 F.2d 409, 411 (9th Cir. 1988); *see also Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (*en banc*).

## II. STATEMENT OF MATERIAL FACTS[3]

The relevant events occurred on September 15, 2021 at RJD. Plaintiff was in the custody of the California Department of Corrections and Rehabilitation ("CDCR") and a participant in RJD's Mental Health Services Delivery System at the clinical case management outpatient level of care. DSUF 1–3. Plaintiff was housed in cell 228, a designated intake cell in an Administrative Segregation ("Ad-Seg") unit at RJD for individuals participating in the Mental Health Services Delivery System. DSUF 4.

That morning, defendants both worked the 6 a.m. to 2 p.m. shift in the Ad-Seg unit where plaintiff was housed. DSUF 14–15. Officer Lechuga worked as Floor Officer 2 and Officer Moreno worked as Security Patrol Officer 2. *Id.* Neither officer was responsible for plaintiff's cell assignment. DSUF 16.

Plaintiff testified that on September 15, 2021, he had "been trying to go suicidal for 72 hours."[4] Doc. No. 66-4 at 12:6; DSUF 17. Dr. Marquez, a RJD staff psychologist, performed a suicide/self-harm risk evaluation on plaintiff that morning in cell 228. DSUF 18–19. Plaintiff testified he told Dr. Marquez he was suicidal and wanted to be removed from his cell because he was having chest pains. Doc. No. 66-4 at 12:10–14; DSUF 20. Neither Officer Lechuga nor Officer Moreno was present during Dr. Marquez's evaluation. DSUF 21–22.

---

[3] These material facts are taken from defendants' Separate Statement of Undisputed Material Facts ("DSUF"), the parties' supporting declarations and exhibits, and plaintiff's verified Complaint. Disputed material facts are discussed in further detail where relevant to the Court's analysis. Facts that are immaterial to resolving defendants' Motion are not included in this recitation.

[4] In his Complaint, plaintiff alleges he attempted suicide on September 13 and again on September 14, 2021; however, he does not allege either Officer Lechuga or Moreno were involved in, or aware of, the prior attempts, and the Court has dismissed all defendants plaintiff alleged are culpable for these two attempts.

That same morning, Officer Lechuga was conducting security/welfare checks of incarcerated individuals housed in the Ad-Seg unit intake cells. DSUF 23. Security/welfare checks are completed twice an hour and involve an officer's personal visual observation of the incarcerated individual's welfare and the cell's security. DSUF 23–24.

After Dr. Marquez left plaintiff's cell, plaintiff informed Officer Lechuga that he was having a panic attack and chest pains and requested to be removed from his cell. DSUF 25. Plaintiff avers he "told C/O Lechuga 'I was still suicidal' and 'I can't breath[e]'" because he was having a panic attack. Doc. No. 1 at 13:11–13; *see also* Doc. No. 66-4 at 16:5–22. Officer Lechuga radioed for assistance. DSUF 28; Doc. No. 66-6 at 2:13–18. "Upon Officer Moreno's arrival . . . [and] pursuant to operational policy, [plaintiff] was placed in mechanical restraints prior to exiting the cell." Doc. No. 66-6 at 2:18–20. Plaintiff says he "overheard Lechuga tell Moreno if [plaintiff] wants to jump off the tier rail let [him] jump." Doc. No. 1 at 13:13–15. Officer Moreno then escorted plaintiff to the stairs, with Officer Lechuga immediately following, and together Officer Moreno and plaintiff began to descend the steps with Officer Moreno using his left hand to hold plaintiff's upper right arm, when plaintiff "without any warning, suddenly [threw] himself headfirst over the stair railing." Doc. No. 66-6 at 2:20–26; *see also* Doc. No. 66-5, Ex. 2–4.

Ad-Seg escort procedures at that time required that all movement by incarcerated individuals in Ad-Seg take place under the direct and constant supervision of a designated Escort Officer and at least one other custody officer. DSUF 7–8. At a minimum both officers must be present, and the incarcerated individual must be secured with mechanical restraints before exiting the cell. DSUF 8–9. Once the incarcerated individual is restrained, the escorting officers must signal the Control Booth Officer ("CBO") to open the cell door. DSUF 10. The incarcerated individual must back out of the cell and face the wall until the CBO secures the cell door, and then the incarcerated individual is escorted to their destination. DSUF 11–12. When escorting up or down stairs, the officers may relinquish physical control of the incarcerated individual and follow one or two stairs behind. DSUF

13. This is the only time the officers may escort an incarcerated individual in an Ad-Seg unit without physical control. *Id.*

Prior to the September 15, 2021 incident, Officer Lechuga "was not aware of [plaintiff's] mental health condition, nor should [he] have been aware of it . . . [d]ue to CDCR's policies concerning medical confidentiality." Doc. No. 66-6 at 3:3–5. He "was not present during [Dr. Marquez's] evaluation," did not "speak to any mental health staff regarding [plaintiff's] mental health condition," and "do[es] not recall [plaintiff] telling [him] anything about his mental health condition . . . or act[ing] in any manner to indicate that he was suicidal." *Id.* at 3:8–10, 12–15. "[E]ven if [plaintiff] had told Officer Lechuga that he was suicidal that morning, Officer Lechuga "would not have changed [his] actions considering [plaintiff's] complaint of chest pain . . . [because] operational policy [requires] an incarcerated person experiencing a potential medical emergency, who is housed in a cell on an upper tier, . . . be placed in mechanical restraints, removed from their cell, and escorted to the lower tier for examination by medical professional." *Id.* at 3:15–20. He denies telling Officer Moreno to allow plaintiff to jump from the top tier and reports his "foremost concern . . . was safely removing [plaintiff] from his cell as expeditiously as possible so that he could receive medical attention for his complaint of chest pains." *Id.* at 3:21–26.

Officer Moreno reports that on September 15, 2021, at approximately 10:47 a.m., he "responded to a radio call requesting assistance with an escort of [plaintiff]." Doc. No. 66-7 at 2:5–8. He "was not aware of [plaintiff's] mental health condition, nor should [he] have been aware of it . . . [d]ue to CDCR's policies concerning medical confidentiality." *Id.* at 2:22–24. He "was not present during [Dr. Marquez's] evaluation," did not "speak to any mental health staff regarding [plaintiff's] mental health condition," and "do[es] not recall [plaintiff] telling [him] anything about his mental health condition . . . , attempting to harm himself . . . or otherwise act[ing] in any manner to indicate that he was suicidal." *Id.* at 2–3:25–5. He also denies that Officer Moreno instructed him to allow plaintiff to jump from the top tier. *Id.* at 3:12–17.

Plaintiff reports "at the last minute [he] decided . . . to take himself over" the upper tier stair rail. Doc. No. 66-4 at 18:20–23. He acknowledges that "without warning . . . [he] purposely jumped over the rail" and his "intention" was to take Officer Moreno with him. *Id.* at 17:11–17, 18:15–18.

### III. PLAINTIFF'S EVIDENCE

Plaintiff does not oppose defendants' Motion and has not proffered any evidence other than his verified Complaint.[5] Doc. No. 1. The relevant facts alleged in plaintiff's Complaint are that on September 15, 2021, after Dr. Marquez "left [plaintiff's] cell," plaintiff

> told C/O Lechuga "I was still suicidal" and "I can't breath[e]." I was having a panic attack. I overheard Lechuga tell Moreno if he wants to jump off the tier rail let the nigger jump. My tray slot was open. I was put in waist restraints. I step out sideways before Lechuga passed me off to Officer Moreno I hear "that's the plan" from Lechuga and Moreno said "alright cool" as if I wasn't there. I walked towards the top tier stairs. I was let go by Moreno and I jumped over the top tier falling to my death.

*Id.* at 13.

### IV. DEFENDANTS' EVIDENCE

Defendants proffer the following evidence in support of their Motion: (1) excerpts from plaintiff's March 11, 2025 deposition; (2) RJC Correctional Lieutenant A. Garvey's declaration; (3) CDCR Incident Log created September 15, 2021; (4) excerpt of Audio-Visual Surveillance ("AVS") video file with footage of the September 15, 2025 incident; (5) excerpt of video footage recorded by Officer Lechuga's Body-Worn Camera ("BWC") on September 15, 2021; (6) excerpt of video footage recorded by Officer Moreno's BWC on September 15, 2021; (7) Officer Lechuga's declaration; and (8) Officer Moreno's

---

[5] A verified complaint "based on personal knowledge and set[ting] forth specific facts admissible in evidence . . . may be considered in opposition to summary judgment" as an opposing affidavit under Fed. R. Civ. P. 56(c)(4). *McElyea v. Babbitt,* 833 F.2d 196, 197 (9th Cir. 1987) (per curiam).

declaration. Doc. Nos. 66-4–66-7, 71. The material facts from plaintiff's deposition and defendants' supporting declarations are summarized in the Statement of Material Facts section above. Defendants' video evidence is summarized below.

### A. AVS Video

The AVS video footage is a 44 second excerpt taken by a stationary wall mounted camera that is directed generally toward cell 228, the second-floor cell where plaintiff was housed just before the September 15, 2021 event. Doc. No. 66-5, Ex. 2. The video clip does not have any audio. At the start of clip, Officer Lechuga is standing immediately in front of the closed door for cell 228 and is shackling plaintiff, who is standing behind the door, through the food port. Officer Moreno stands immediately to Officer Lechuga's right and is also facing the closed door. At the 22 second mark, the officers slide the door open after signaling to CBO to unlock the cell door. Plaintiff backs out of the cell wearing restraints and a towel wrapped around his waist. Officer Moreno then holds plaintiff's right arm and escorts him a few steps to the top of an open stairway. Officer Lechuga follows a few steps behind them. Officer Moreno and plaintiff begin to descend the stairs with Officer Moreno continuing to hold plaintiff's right arm. Officer Lechuga follows immediately behind them. When plaintiff and Officer Moreno descend to the second step, plaintiff suddenly stops walking and throws himself to his left, away from Officer Moreno and over the stairway handrail to the concrete floor below. *Id.*

### B. Officer Lechuga BWC

The excerpt from Officer Lechuga's BWC is 37 seconds long. Doc. No. 66-5, Ex. 3. It begins as he applies restraints to plaintiff through the cell door food port. Officer Moreno first appears on video at the 7 second mark, after Officer Lechuga has finished applying the restraints. The officers then call out "228," indicating the cell door will soon open. Up until this point the audio does not capture any conversation between the officers. At the 13 second mark, immediately before the cell door opens, Officer Lechuga says "careful, be careful." Plaintiff then backs out of the cell. Officer Moreno takes plaintiff by the right arm, just above the elbow, as Officer Lechuga says "you got it." They proceed towards the

open stairway and as they reach it, Officer Lechuga says "put him in that first cage," pointing in the direction of a stand-along holding cell on the lower level. Plaintiff then suddenly throws himself over the handrail and out of Officer Moreno's grasp. *Id.*

### C. Officer Moreno BWC

The excerpt from Officer Moreno's BWC is also 37 seconds long. Doc. No. 66-5, Ex. 4. It begins with a side view of Officer Lechuga applying restraints to plaintiff through the food port, at about the same point in time the excerpt of Officer Lechuga's BWC begins. At the 25 second mark Officer Moreno directs plaintiff to "step out" of the cell and plaintiff steps out backwards. As Officer Moreno escorts plaintiff to the staircase, he asks "chest pains," to which plaintiff replies "ya." They descend the first step with Officer Moreno holding plaintiff above the elbow until plaintiff throws suddenly himself over the handrail. *Id.*

### V. LEGAL STANDARDS

A party may move for summary judgment as to a claim or defense. Fed. R. Civ. Proc. 56(a). Summary judgment is appropriate where the Court is satisfied there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* Material facts are those that may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The initial burden of establishing the absence of a genuine issue of material fact falls on the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may meet this burden by identifying the "portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that show an absence of dispute regarding a material fact. *Id.* (internal quotations omitted).

Once the moving party satisfies this initial burden, the nonmoving party must "designate specific facts showing that there is a genuine dispute for trial." *Id.* at 324 (internal quotation marks omitted). This requires "more than simply show[ing] that there

is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To survive a summary judgment motion, the nonmoving party must "by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts'" that would allow a reasonable fact finder to return a verdict for the nonmoving party. *Pacific Gulf Shipping Co. v. Vigorous Shipping & Trading S.A.*, 992 F.3d 893, 897 (9th Cir. 2021) (*quoting Celotex*, 477 U.S. at 324). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. The nonmoving party cannot oppose a properly supported summary judgment motion by "rest[ing] on mere allegations or denials of his pleading[s]." *Id.* at 256.

Courts should "construe liberally motion papers and pleadings filed by pro se inmates and should avoid applying summary judgment rules strictly." *Wilk v. Neven*, 956 F.3d 1143, 1147 (9th Cir. 2020) (*quoting Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010)).

## VI. DISCUSSION

Defendants seek summary judgment, arguing plaintiff's deliberate indifference claim is unsupported.

The Eighth Amendment prohibits prison officials' "deliberate indifference to a prisoner's serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). This includes "both an objective standard—that the deprivation was serious enough to constitute cruel and unusual punishment—and a subjective standard—deliberate indifference." *Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012), overruled in part on other grounds by *Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014) (en banc).

To meet the Eighth Amendment's objective requirements, the prisoner must demonstrate the existence of a serious medical need. *Estelle*, 429 U.S. at 104. With respect to the first prong, "[a] heightened suicide risk or an attempted suicide risk is a serious medical need." *Conn v. City of Reno*, 591 F.3d 1081, 1095 (9th Cir. 2010), vacated, 563 U.S. 915 (2011), opinion reinstated in relevant part, 658 F.3d 897 (9th Cir. 2011).

To meet the Eighth Amendment's subjective requirement of deliberate indifference, a "high legal standard," a prisoner must demonstrate the defendant subjectively "kn[e]w[ ] of and disregard[ed] an excessive risk to [his] health and safety." *Toguchi v. Chung*, 391 F.3d 1051, 1057, 1060 (9th Cir. 2004) (internal quotation marks and citation omitted). This "requires more than ordinary lack of due care." *Farmer v. Brennan*, 511 U.S. 825, 835, (1994) (internal quotation marks omitted) (*citing Whitley v. Albers*, 475 U.S. 312, 319 (1986)). "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

### A. No Showing of Deliberate Indifference to an Imminent Risk of Self Harm

Here, there is no triable issue of fact to show either Officer Lechuga or Moreno subjectively knew of and disregarded an excessive risk to plaintiff's health and safety.

Neither Officer Lechuga nor Moreno were responsible for plaintiff being housed on the upper tier of the Ad-Seg unit and, thus, plaintiff does not show they are liable for his cell assignment. *See, e.g., Sekerke v. Arkwright*, No. 3:20-CV-1045-JO-AHG, 2023 WL 6390427, at *6 (S.D. Cal. Sept. 28, 2023) (official not within the housing conditions chain of command did not have responsibility to fix conditions in Ad-Seg).

Additionally, neither defendant knew or could have reasonably known plaintiff was likely to jump off the second-tier or otherwise commit self-harm when they escorted him for medical evaluation of his chest pain. The evidence shows prior to plaintiff's jump from the second-tier, neither officer was aware of plaintiff's mental health condition or two prior suicide attempts, and neither were present during his conversation with Dr. Marquez that morning. DSUF Nos. 19, 21–22, 30, 43. It is also undisputed that neither defendant observed plaintiff attempting self-harm or otherwise act in any manner to indicate he was suicidal before they removed him from his cell that morning. DSUF 27, 34.

While plaintiff avers that when he summoned Officer Lechuga to his cell he "told C/O Lechuga 'I was still suicidal' and 'I can't breath[e]'" because he was having a panic attack, Officer Lechuga "do[es] not recall [plaintiff] telling [him] anything about his mental

health condition . . . or act[ing] in any manner to indicate that he was suicidal." *cf*. Doc. No. 1 at 13:11–12 and Doc. No. 66-6 at 3:12–15. Even assuming plaintiff's version of the conversation is true, there is no genuine dispute about material facts. Officer Lechuga could not have known or reasonably suspected that plaintiff's alleged statements meant plaintiff was in imminent danger of self-harm considering plaintiff did not display any signs of mental distress and Officer Lechuga was unaware of plaintiff's prior suicide attempts or his mental health status. *See Gibson v. Cnty. of Washoe, Nev.*, 290 F.3d 1175, 1197 (9th Cir. 2002) (en banc) *overruled on other grounds by Castro v. County of Los Angeles*, 833 F.3d 1060, 1076 (9th Cir. 2016) (despite lapses in communications by other jail employees, deputies who mistook a detainee's symptoms for mere anger or intoxication were *not* deliberately indifferent, because "all [they] knew about [his] mental condition was what they could observe of his behavior," and because that behavior did not "obviously" connote serious illness.); *see also Vivanco v. California Dep't of Corr. & Rehab.*, No. 1:17-CV-00434-BAM, 2019 WL 2764397, at *8–9 (E.D. Cal. July 2, 2019). ("Even in those cases where an obligation to prevent an inmate's suicide has been recognized in the Ninth Circuit, there was an imminent, rather than sporadic suicide risk that was ignored by defendant officers who were aware of that looming risk.")

Moreover, plaintiff has not shown Officer Lechuga's actions that morning were "unreasonable under the circumstances." *Harris v. Kyle*, No. 19-cv-0462-DAD-EPG, 2022 WL 977050, at *16 (E.D. Cal. Mar. 31, 2022) (recommending summary judgment for defendants where "even if plaintiff did inform [California State Prison Cocoran staff] that he became suicidal in the [Short Term Restricted Housing], plaintiff failed to show that these defendants' response was unreasonable in light of all the circumstances.") It is undisputed that plaintiff complained to Officer Lechuga of chest pain and breathing difficulty. Doc. No. 1 at 13:11–12. It is also undisputed that Officer Lechuga's subjective and "foremost concern at that time was safely removing [plaintiff] from his cell as expeditiously as possible so that he could receive medical attention for his complaint of chest pains." Doc. No. 66-6 at 3:24-26. Officer Lechuga then followed "operational policy

[which requires that] an incarcerated person experiencing a potential medical emergency, who is housed in a cell on an upper tier . . . be placed in mechanical restraints, removed from their cell, and escorted to the lower tier for examination by medical personnel." *Id*. at 3:17–20. Plaintiff shows no evidence to suggest Officer Lechuga's actions were unreasonable under the circumstances.

With respect to Officer Moreno, plaintiff admits he "never told Moreno nothing" and "[his] first time running into Moreno" is captured "on the video" evidence, but he "believe[s]" Lechuga told Moreno about plaintiff's suicidal ideation. Doc. No. 66-4 at 17:3-6. His Complaint describes a verbal exchange between Officers Lechuga and Moreno that allegedly occurred immediately before plaintiff threw himself from the second-tier. Doc. No. 1 at 13:13–15. These allegations are blatantly contradicted by defendants' video evidence and, therefore, do not create a genuine issue of material fact. *See Vos v. City of Newport Beach*, 892 F.3d 1024, 1028 (9th Cir. 2018) (On summary judgment the record is viewed in the light most favorable to the nonmoving party "so long as their version of the facts is not blatantly contradicted by the video evidence."); *see also Scott v. Harris*, 550 U.S. 372, 378–79, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (focusing on whether a party's version of events "is so utterly discredited by the record that no reasonable jury could have believed him"). Thus, plaintiff has presented no evidence to indicate Officer Moreno could have known or reasonably suspected plaintiff was in imminent danger of self-harm considering plaintiff did not display any signs of mental distress and Officer Moreno was unaware of plaintiff's prior suicide attempts or his mental health status. *See Gibson*, 290 F.3d at 1197.

Plaintiff also failed to show facts that would support a finding that Officer Moreno's actions were unreasonable under the circumstances. It is undisputed that Officer Moreno arrived to escort plaintiff after he complained to Officer Lechuga of chest pain and breathing difficulty. Doc. No. 1 at 13:11–12. There is no genuine issue of material fact that upon arrival at plaintiff's cell, Officer Moreno followed operational policy in ensuring plaintiff was placed in mechanical restraints and escorted for medical evaluation. Plaintiff

has not, therefore, presented facts that might show Officer Moreno's actions were unreasonable under the circumstances. *See Harris*, 2022 WL 977050, at *16.

Plaintiff has not presented evidence that could show either defendant was subjectively aware plaintiff had a heightened risk of self-harm before he jumped from the top-tier, or that either defendant acted unreasonably under the circumstances. Therefore, there is no triable issue of fact regarding whether either defendant was deliberately indifferent to an imminent risk of self-harm by plaintiff.

### B. No Showing of Causation

Plaintiff also has not shown facts to suggest either Officer Lechuga or Moreno was the proximate cause of plaintiff's September 15, 2021 suicide attempt.

Eighth Amendment liability attaches only if the purported deliberate indifference was the cause of the inmate's injury. *Leer v. Murphy*, 844 F.2d 628, 634 (9th Cir. 1988). "[P]laintiffs alleging deliberate indifference must also demonstrate that the defendants' actions were both an actual and proximate cause of their injuries." *Lemire v. California Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1074 (9th Cir. 2013) (citation omitted). The proximate cause question "asks whether the unlawful conduct is closely enough tied to the injury that it makes sense to hold the defendant legally responsible for the injury." *Mendez v. Cnty. of Los Angeles*, 897 F.3d 1067, 1076 (9th Cir. 2018). As the Supreme Court has observed, the proximate cause requirement serves "to preclude liability in situations where the causal link between conduct and result is so attenuated that the consequence is more aptly described as mere fortuity." *Paroline v. United States*, 572 U.S. 434, 445 (2014).

Plaintiff has not shown his decision to jump over the second-tier handrail was due to anything Officers Lechuga or Moreno did or failed to do. Defendants removed plaintiff from his cell because he asked for medical treatment and provided the officers with a reason for removal that they could not disregard— chest pains. DSUF Nos. 25–26, 28. It is undisputed that both defendants followed operational procedures thereafter, so plaintiff has not shown any breach of these procedures caused him to jump. DSUF Nos. 49–52.

/ /

Moreover, plaintiff acknowledges that "without warning . . . [he] decided . . . to take himself over" the upper tier stair rail "at the last minute" and he "purposely jumped over the rail" "without warning." Doc. No. 66-4 at 17:11–17, 18:21–23. His intention was to take Officer Moreno with him over the handrail. *Id.* at 18:15–18. These undisputed facts suggest plaintiff was aware of and in control of his actions, and do not suggest either defendant proximately caused plaintiff to jump over the second-tier handrail. *See Soto v. City of Sacramento*, 567 F. Supp. 662, 694 (E.D. Cal. 1983) ("[I]f at the time of the attempted suicide plaintiff was able to appreciate the nature of his act and able to control his conduct, but chose freely to attempt suicide, defendants would not be liable for the injuries sustained by virtue of the attempted suicide."); *White v. Roper*, 901 F.2d 1501, 1506 (9th Cir. 1990) (a defendant's conduct is not the proximate cause of the plaintiff's injury "if another cause intervenes and supersedes his liability for the subsequent events").

### C. Qualified Immunity

Alternatively, defendants move for summary judgment on the grounds they are entitled to qualified immunity.

On summary judgment, courts generally resolve questions of qualified immunity through a two-pronged inquiry. *Tolan v. Cotton*, 572 U.S. 650, 655 (2014). The first prong "asks whether the facts, '[t]aken in light most favorable to the party asserting the injury, ... show the officer's conduct violated a [federal] right[.]'" *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). The second prong "asks whether the right in question was 'clearly established' at the time of the violation." *Id.* at 656 (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)); *see also Sharp v. Cnty. of Orange*, 871 F.3d 901, 909 (9th Cir. 2016). The court is not required to address the prongs in any particular order. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) ("[T]he judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.").

In this matter, with respect to plaintiff's Eighth Amendment claims, where "no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier*, 533 U.S. at 201; *County of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998) ("[T]he better approach to resolving cases in which the defense of qualified immunity is raised is to determine first whether the plaintiff has alleged the deprivation of a constitutional right at all.").

Here, the Court does not need to decide the issue of qualified immunity because the Court is recommending summary judgment in favor of defendants on the ground that there is no genuine dispute regarding plaintiff's Eighth Amendment claims.

## VII. CONCLUSION

Based on the foregoing, the undersigned **RECOMMENDS** the District Court **GRANT** defendants' Motion.

**IT IS HEREBY ORDERED** that no later than **August 22, 2025,** any party to this action may file written objections to this Report and Recommendation with the District Court and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the District Court and served on all parties no later than **August 29, 2025**. The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the District Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

Dated: August 7, 2025

Hon. Karen S. Crawford
U.S. Magistrate Judge